ERIC D. CHAN (State Bar No. 253082)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181
E-Mail:  echan@health-law.com

Attorneys for Salinas Valley Memorial Hospital System

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| SALINAS VALLEY MEMORIAL HEALTHCARE SYSTEM,<br><br>        Plaintiff,<br><br>    vs.<br><br>ENVIROTECH MOLDED PRODUCTS, INC., ENVIROTECH MOLDED PRODUCTS, INC. EMPLOYEE BENEFIT PLAN,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **BENEFITS UNDER SECTION 502(a)(1)(B) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**<br><br>2. **AFFORDABLE CARE ACT SECTION 2707(b) (OUT OF POCKET MAXIMUM), VIA ERISA SECTION 502(a)(1)(B)**<br><br>3. **INTENTIONAL MISREPRESENTATION**<br><br>4. **NEGLIGENT MISREPRESENTATION**<br><br>**DEMAND FOR JURY TRIAL** |

1231872.2

COMPLAINT

Plaintiff Salinas Valley Memorial Healthcare System (the "Hospital") alleges as follows:

1. This lawsuit arises from the failure to properly pay the Hospital for the extensive medical care provided to a very ill woman ("Patient").[1] The Hospital is informed and believes that in 2016, Patient was a beneficiary of the Envirotech Molded Products Plan (the "Plan"). Patient had a serious illness and was admitted to the Hospital on two separate occasions for intensive inpatient care. The Hospital's bill for Patient's care totaled $200,444.85. Yet the Plan, through its representatives, paid just $63,581.36 – less than a third of the bill. Defendants left Patient exposed to pay the rest.

2. Notwithstanding numerous appeals by the Hospital, including on June 20, 2016 and July 14, 2016, the Plan has refused to pay a cent more. The refusal by the Plan to pay this bill appropriately was caused by the improper conduct of Defendants on multiple levels.

3. As described more fully herein, Defendants caused this substantial underpayment through a calculated scheme to circumvent, among other things, the following:

   a. The Maximum Out-of-Pocket (MOOP) limitation that is set forth in the Plan's own plan documents for calendar year 2016;

   b. The MOOP limit that the federal Affordable Care Act ("ACA") imposed upon the Plan in 2016;

   c. The requirement under ERISA that plan documents be written in a manner calculated to be understood by the average plan participant; and

   d. The representations made by the Defendants or their representatives to the Hospital during the Patient's stay to verify and authorize the coverage.

---

[1] The patient's name is not included to protect privacy. But the Hospital has engaged in communications with all of the Defendants about the Patient, and is informed and believes they all know from the allegations contained in this Complaint the identity of the Patient. The Hospital also can and will provide confirming identifying information to the defendants and the Court outside the context of a public filing and/or pursuant to a Court order.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL.: (310) 551-8111 • FAX: (310) 551-8181

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States; and pursuant to 29 U.S.C. § 1132(e)(1), because the action seeks to enforce rights under the Employee Retirement Income Security Act ("ERISA"); and supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because there is a common nucleus of facts relating to Defendants' wrongful decision to underpay the Hospital for the extensive medical services it provided to Patient.

5. The San Jose Division of the United States District Court for the Northern District of California is the appropriate venue for the filing of this case pursuant to Northern District Local Rules 3-2(c) (Assignment to a Division) and 3-2(e) (San Jose), because a substantial part of the events or omissions which give rise to the Hospital's claims occurred in Monterey County.

## THE PARTIES

6. Plaintiff Salinas Valley Memorial Healthcare System is a highly-respected public hospital district and health system located in Monterey County, which has been serving the Salinas Valley and Monterey Peninsula since 1953. SVMHS's flagship facility is the Salinas Valley Memorial Hospital, a 266-bed acute care facility with a medical staff of more than 300 board-certified physicians across a broad spectrum of specialties. The Hospital prides itself in delivering exceptional, compassionate and culturally sensitive care and holding true to its mission of improving the health and well-being of its community. Among other distinctions and awards, the Hospital received full accreditation status to the Cancer Program of the Commission on Cancer; received the Stroke Gold Plus Quality Achievement Award from the American Heart Association / American Stroke Association's Get With the Guidelines program; and was the 2015 The Joint Commission Top Performer on Key Quality Measures for 2014 for Heart Attack, Heart Failure, Pneumonia, Surgical Care and Perinatal Care.

7. On information and belief, Defendant Envirotech Molded Products, Inc. ("Envirotech") is an Utah corporation with its primary place of business in Salt Lake City, UT. Hospital is informed and believes that Envirotech is the designated Plan Administrator and Named Fiduciary for the Envirotech Molded Products, Inc. Employee Benefit Plan.

8. On information and belief, the Envirotech Molded Products, Inc. Employee Benefit Plan (the "Plan") is a self-funded ERISA health benefits plan, and a proper defendant pursuant to ERISA § 502(d), 29 U.S.C. § 1132(d). "Self-funded" means that the Plan is not directly operated pursuant to one or more contracts for health insurance. Rather, it is directly responsible for the medical benefits paid pursuant to the Plan. The Hospital is informed and believes that Envirotech is the sponsor of the Plan, and moreover, that Envirotech is the Plan Administrator as that term is understood under ERISA. The Hospital is informed and believed that Patient was a beneficiary of the Plan during at least calendar year 2016 when the services were rendered by the Hospital.

9. The manner in which the Defendants have conducted themselves when communicating about the bill for the services to the Patient has made it difficult if not impossible to determine which of them really is the Plan Administrator and/or whether more than one of them share some of the Plan Administrator responsibilities such that one or more of them have become in part or in full the *de facto* Plan Administrator. The complete facts regarding the relationship between the Defendants remain unclear at this time.

10. The true names and capacities of the defendants sued herein as DOES are unknown to Hospital at this time, and Hospital therefore sues such defendants by such fictitious names. Hospital is informed and believe that the DOES are those individuals, corporations and/or businesses or other entities that are also in some fashion legally responsible for the actions, events and circumstances complained of herein, were the agents, representatives, or employees of the other defendants, and may be financially responsible to Hospital for the services it has provided to the Patient. The Complaint will be amended to allege the DOES' true names and capacities when they have been ascertained.

11. The Defendants named above, along with the DOES, will be collectively referred to herein as the "Defendants."

## GENERAL ALLEGATIONS
### The Plan Contains a MOOP Limitation

12. The Hospital is informed and believes that the Plan contains a MOOP provision, e.g., one that limits a patient's cost-sharing responsibilities to no more than a fixed amount per

year. The Hospital is further informed and believes that, in 2016, the Plan's MOOP limit was approximately $3,000 for individual coverage.

13. The Hospital has not been able to directly verify the language of the MOOP provision, because, despite multiple requests by the Hospital, Defendants have repeatedly declined to furnish the written instruments that govern the Plan. After the services had been rendered, and during the appeals process, Defendants provided Hospital with what they claimed were excerpts of a Summary Plan Description ("SPD") for the Plan. These excerpts did not contain any language specifying the MOOP. However, when Hospital called to verify the Patient's benefits, it was told that there was a $3,000 Maximum Out-of-Pocket limit, as well as a $1,000 deductible.

14. Health plans like the Plan have a MOOP limitation in order to ensure that beneficiaries like the Patient are not subject to crippling financial liability in the case of health high care bills in a single year. This is why virtually every health plan, including and especially ERISA self-funded plans, will have a MOOP. The Plan's stated MOOP was *supposed* to represent the upper limit of what the Patient could be required to pay in calendar year 2016. Instead, the Plan's decision to pay less than a third of the bill left the Patient on the hook for the bill's remainder, approximately $200,444.85. This represents a far greater exposure than the Plan's supposed MOOP limit of $3,000 in calendar year 2016.

**The Affordable Care Act Also Imposes a MOOP Requirement
on Essential Health Benefits Under the Plan**

15. In addition to any language that was in the governing Plan documents for the year 2016, ACA establishes MOOP requirements with respect to Essential Health Benefits ("EHBs") offered by health plans. EHBs include items and services in ten general categories, including hospitalization and emergency services. *See* ACA Section 1302(b). All of the services that the Hospital rendered to the Patient fit within one or both of these two EHBs.

16. As part of ACA, starting in the year 2014 and thereafter, the federal government has required plans like this one to have a MOOP with respect to all offered EHBs. Congress enacted this MOOP requirement to prevent plans like this one from purporting to offer coverage

that turns out not be adequate when a beneficiary requires extensive health care.  Accordingly, *even if* the Plan did not apparently have a $3,000 MOOP, the Plan would have been required by federal law to have a MOOP no higher than the one set by ACA with respect to all offered EHBs.  In the year 2015, ACA set a MOOP of no more than $6,850.  Accordingly, even if the Plan did not expressly include a MOOP limit, it would have been required by law to have a MOOP applicable to all EHBs no higher than $6,850.[2]

17. ACA's MOOP limitation requirement is found in Section 2707 of the Public Health Service Act, captioned "Comprehensive health insurance coverage" (42 U.S.C. §300gg-6) and Section 1302, captioned "Essential Health Benefit Requirements" (42 U.S.C. §18022).  Subsections (a) and (b) of Section 2707 require coverage for EHBs – including hospitalization and emergency services – with strict limitations on annual cost sharing.  Section 2707(b) states:

> *(b) Cost-sharing under group health plans*
>
> A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under paragraphs (1) and (2) of section 1302(c).

18. Section 1302(c)(1) and (2), in turn, establish annual limits on "cost-sharing incurred under a health plan with respect to self-only coverage or coverage other than self-only coverage" in 2014 and subsequent years.  This includes the plan year for the Patient at issue, which is 2016.  For these purposes, "cost-sharing" is defined to include "deductibles, coinsurance, copayments, or similar charges" and any other expenditures required of an insured individual which is a qualified medical expense (within the meaning of section 223(d)(2) of title 26) **with respect to essential health benefits covered under the plan**." *See* ACA Section 1302(c)(3)(A) (emphasis added).

19. EHBs are defined broadly and specifically to include, among other things, hospitalization and emergency services.  *See* ACA Section 1302(b).  Read together with Sections

---

[2] *See* Department of Health and Human Services, Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10750-01 at 10825; *see also* Departments of Labor, Health and Human Services, and Treasury, ACA Implementation FAQs Set 18, January 9, 2014, available at https://www.dol.gov/ebsa/faqs/ or at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs18.html.

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

2707(b) and 1302(c), these provisions evidence a clear intent by Congress to require complete coverage of such EHBs when they are offered by a health plan, not just coverage at a very minimal substandard level that is calculated never to reach anywhere near any of the bills.

20. ACA's MOOP provisions apply directly to self-funded ERISA plans. Section 715 of ERISA, (29 U.S.C. § 1185d), which was added by ACA Section 1563(e), incorporates the provisions of part A of title XXVII of the PHS Act – including ACA Section 2707.

### Defendants Applied Wholly Improper, Arbitrary, and Capricious Interpretations of the Plan to Eviscerate the Patient's Coverage for the Services Rendered by the Hospital

21. After the services were rendered the Defendants intentionally, improperly, arbitrarily and capriciously interpreted the written document that governs the Plan in order to grossly underpay the Hospital on the Patient's medical bills:

### Defendants Failed to Honor the MOOP

22. Despite telling the Hospital that the Plan had a $3,000 MOOP in calendar year 2016, Defendants have administered the MOOP in a manner that effectively renders this an empty promise.

23. Defendants do so by starting with the unsupported assumption that they never have to pay more than the rate that the federal government pays under the Medicare program, plus 20%. This makes the MOOP illusory since 120% of Medicare rates represent just a fraction of the standard charges by the Hospital and all other hospitals in this geographic area (as well as many others).

24. From this improper starting point, Defendants nullified the Plan's MOOP provision in at least two ways. First, Defendants only allowed a fraction of patients' out-of-pocket liability to qualify for the Plan's nominal MOOP threshold. Specifically, Defendants took the position that the MOOP limit was not "met" until after the patient's financial liability was nearly twenty thousand dollars, rather than the stated $3,000. Second, even after Defendants finally deemed the MOOP to be met, they still only covered a small fraction of the patient's bill – e.g., 120% of

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

Medicare rates– still leaving the patient exposed to the rest of the bill.

25. Defendants' unsustainable interpretations defeat the entire purpose of having a MOOP. The purpose of the MOOP is to protect patients against bills exceeding the MOOP threshold. Nothing in the Plan disclosed that the MOOP threshold has limitations and exclusions that will eviscerate it for hospital services, which per ACA is one of the EHBs that must be covered by the MOOP.

26. Under the terms of the Plan as represented to the Hospital, as well as under industry custom and usage, the method by which the MOOP is met should be fairly simple. Here's how it should work. The first $1,000 of the Hospital's bill is assigned directly to the Patient in order to satisfy the Plan's deductible limit, and counts towards satisfying the $3,000 MOOP threshold. The portion of the bill above the $1,000 also counts towards satisfying the MOOP until the remainder of the $3,000 threshold is met. The amount of the bill above the MOOP is the full responsibility of the plan since the deductible has been satisfied and the MOOP has been reached.

27. However, Defendants severely limited what expenses Defendants counted for the MOOP. Specifically, the Hospital is informed and believes that, according to Defendants, only the deductible, "co-insurance," and "co-payments" counted toward the MOOP threshold. In doing so, Defendants ignored tens of thousands of dollars of the Patient's medical bills before deeming the MOOP threshold to have been met.

28. Moreover, even after the MOOP finally "kicks in," Defendants still take the position that the Plan covers only 120% of Medicare, rather that covering the entire portion of the bill above the MOOP. Defendants are not really covering 100% of the bill above the MOOP at all, and that they continue to leave the Patient on the hook for the remainder above the MOOP. Under Defendants' absurd interpretation of the Plan, the only thing that changes after the Plan's MOOP is met is that the Plan increases the level of payment from 96% of Medicare rates (e.g., 80% of *120% of Medicare*) to 120% of Medicare (100% of *120% of Medicare*). Since the charges of all hospitals in the area are well above 120% of Medicare, this means Defendants' untenable math always leaves the Patient on the hook for the vast bulk of hospital bills, for this Hospital and any other hospital, including bills for ACA protected EHBs.

**<u>Defendants Improperly Relied Upon Unenforceable, Inadequately Disclosed Plan Provisions To Avoid Paying the Reasonable and Customary Charges</u>**

29. The Hospital is also informed and believes that Defendants have also violated the legal requirement that an SPD "shall be written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022. The regulations enforcing this statute unambiguously require that limitations and exclusions not be minimized or obscured, stating:

> General format. The format of the summary plan description **<u>must not have the effect to misleading, misinforming or failing to inform</u>** participants and beneficiaries. **<u>Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant</u>**. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner **<u>not less prominent</u>** than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented **<u>without either exaggerating the benefits or minimizing the limitations</u>**.

29 C.F.R. § 2520.102-2(b) (emphasis added).

30. The regulations only permit limitations and exclusions to be stated in a separate place from the benefits if the SPD expressly sets forth in the benefits section the specific page where the pertinent limitations and exclusions can be found. Specifically, the regulation instructs as follows: "The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, **<u>provided that adjacent to the benefit description the page on which the restrictions are described is noted</u>**." (*Id*. (emphasis added).)

31. Again, while the Hospital has not been able to obtain a complete copy of the governing Plan documents and/or SPD, the Hospital is informed and believes that the SPD does not disclose any limitations on the benefits offered by the Plan in sufficiently close proximity. Such limitations (e.g., payment at 120% of Medicare) are thus unenforceable.

32. Defendants' erroneous interpretation of the Plan language relies on assertions about the Plan's language that, were those assertions the Plan's intent, then the SPD would not be in compliance with these requirements either.

**The Plan Cannot Avoid Its Obligations Based On the Assertion that the Patient Should Have Gone To An "In-Network" Hospital**

33. On Information and belief, the Plan has no in-network hospitals – not in Salinas, the Monterey Peninsula, or anywhere else. Thus, as far as emergency services and hospital care is concerned, Defendants intentionally set up a Plan structure where there is no network at all. This means that there is no such thing here as an in-network hospital option for the Patient to select. Likewise, by definition, no such thing here as an out-of-network hospital. The concept of in-versus-out-of-network for provider types only exists for situations when there is a network of such provider types.

34. For this reason, the MOOP limitation cannot be avoided by failing to have any network of providers with respect to offered EHBs.

35. In addition, the Patient arrived at the Hospital due to an emergency. ACA does not permit health plans to leave members with higher exposure for emergency care. The Patient did not come to the Hospital, or for that matter any hospital, by choice. Thus, this is not a situation where the Patient could have chosen to go in-network in order to reduce the cost of care. The entire structure set up by Defendants is simply designed to offer the "illusion" of coverage.

**The Plan, Through Its Representatives, Promised to Pay Almost All of the Patient's Bills, and Failed to Disclose Any of the Coverage Limitations It Now Seeks to Impose**

36. Defendants have also violated the promises they made directly to the Hospital during the patient's inpatient stay, to pay for nearly all of the Hospital's bills.

37. For example, in or around mid-January 2016, when the Patient was still at the Hospital, the Hospital called to verify the Plan's benefits for the Patient. "Jennifer," an individual speaking on behalf of the Plan, confirmed that the Patient's benefits were effective January 1, 2016; that the Plan had a $1,000 deductible for calendar year 2016, which had not yet been met; and that among other benefits, the Plan covered semiprivate inpatient care (e.g., a hospital room). Jennifer further confirmed that such care would initially be covered at 70% up to $10,000, and then would be paid at 100% thereafter. Jennifer also confirmed that the Plan had a Maximum Out-of-Pocket limit of $3,000 in calendar year 2016, which had not yet been met.

38. Subsequently, in or around mid March, 2016, the Hospital called again to verify the Plan's benefits for the Patient. This time, the Hospital spoke with an individual named "Heidi." After confirming the $1,000 deductible and January 1, 2016 effective date of coverage; Heidi represented that the Plan would actually pay 80% for inpatient care up to $20,000, and after that point, would pay 100% for such care. The only limitation disclosed by Heidi on inpatient care benefits was that the Plan would pay for up to 60 days of inpatient care in any given calendar year.

39. It is unclear what relationship the $3,000 MOOP, the $10,000 threshold identified in the January 2016 call, and the $20,000 threshold identified in the March 2016 have with each other. However, given the purpose and function of a MOOP, it is reasonable to believe that the $3,000 threshold controls – since $3,000 supposedly represents the maximum that a Plan beneficiary or participant (such as the Patient) must pay in any given calendar year. A reasonable beneficiary of the Plan would understand that, after incurring $3,000 in out-of-pocket liability in the year 2016, he or she would not be responsible for paying any more health care expenses out of pocket for the rest of that year.

40. Thus, taken together, the customary meaning of the Plan's representations is that the Plan would pay 80% of the Hospital's total bill up to the $3,000 MOOP, and beyond that, the Plan would pay 100% of the Hospital's charges. Given that the Patient was not admitted to the Hospital for anywhere close to 60 days, this is what the Hospital expected to be paid for care rendered to the patient. Defendants disclosed no other limitations on payment to the Hospital.

41. Other than those identified above, Defendants did not identify any limitations or exclusions when authorizing the care or verifying the benefits for the Hospital. At no point during these conversations did they tell the Hospital that the Plan would not pay more than 120% of Medicare for hospital services. They also never disclosed that the Plan had a purported limitation buried in the undisclosed documents based on an amorphous Medicare-based limitation that superseded benefits otherwise payable under the Plan. The verification and authorization statements by the Plan never even mentioned a purported Reasonable and Customary limitation or exclusion. Nor did Defendants explain that they interpreted this undisclosed "Reasonable and Customary" provision to really mean a strict upper limit of 120% of Medicare rates for any and all

1  hospital services.

2  42.  For the record, the rates paid by Medicare are not consistent with the industry
3  custom and usage meaning of "Reasonable and Customary."

4  43.  Thus, the Hospital had no reason to expect, based on Defendants' representations,
5  that the Plan would really only pay at 120% of Medicare rates – as opposed to 80% and then later
6  100% of the Hospital's reasonable charges.

7  44.  Medicare is a special federal government program that provides coverage to the
8  elderly and certain disabled persons at rates imposed by the federal government.  Medicare rates
9  were not designed to apply to non-Medicare beneficiaries.  Medicare rates were designed to pay
10 for only the costs associated with rendering care to the limited population of Medicare
11 beneficiaries.  The Hospital is informed and believes that the federal government does not set
12 Medicare rates based on market value and does not intend to set them based on market value.
13 Indeed, the California Department of Managed Health Care ("DMHC") has found that Medicare
14 rates are designed to pay less than customary and reasonable rates as that term is defined for
15 California's parallel health care benefit plans.

16 45.  On the other hand, the terms reasonable and customary in the health care industry
17 has its origins in fair market value concepts based on what competitors in the area charge for
18 similar services.  The charges of the Hospital and other California hospitals in the area are a matter
19 of public record that gets published each year through the California Office of Statewide Health
20 Planning and Development ("OSHPD").  Accordingly, Defendants knew or should have known
21 that the charges of the Hospital are consistent with the charges of other hospitals in the Salinas /
22 Monterey Peninsula area, and that all hospitals in the area charge many times more than the
23 government's rates for services to those who qualify for Medicare benefits.

24 46.  Defendants also did not disclose to the Hospital during the verifications and
25 authorizations any alleged limitation or exclusion upon the plan's stated MOOP.  For instance,
26 according to Defendants' arbitrary, capricious and previously undisclosed reading of the Plan, (a)
27 the Patient would have to incur tens or hundreds of thousands of dollars in actual, balance bill
28 liability before the MOOP would be considered met, rather than just the stated MOOP limitation

HOOPER, LUNDY & BOOKMAN, P.C.
1875 CENTURY PARK EAST, SUITE 1600
LOS ANGELES, CALIFORNIA 90067-2517
TEL: (310) 551-8111 • FAX: (310) 551-8181

1231872.2

11
COMPLAINT

of $3,000; and (b) even after the Plan considered the MOOP met using this absurd reading the Plan still only would cover 120% of Medicare rates for the Patient's bills, leaving the Patient to incur substantial out-of-pocket liability far above the MOOP. These concepts were not disclosed when the Hospital obtained verification and authorization.

47. Likewise, at no point did Defendants tell the Hospital that the Plan's undisclosed cap on payment at 120% of Medicare would trump the stated MOOP for the year 2016. And there is no reason why it should since doing so would eviscerate the MOOP.

## FIRST CAUSE OF ACTION

### (ERISA Section 502(a)(1)(B))

(Against All Defendants)

48. Hospital incorporates all allegations set forth in the above paragraphs.

49. The Hospital is the assignee of the Patient's benefits, pursuant to "Conditions of Admission" form executed by the Patient and/or a representative.

50. Accordingly, the Hospital is entitled under ERISA to pursue all payment that are due to the Patient under the Plan.

51. The Hospital diligently pursued all internal appeals available under the Plan and exhausted all appeal remedies. In doing so, the Hospital corresponded directly with entities and/or individuals that the Plan held out to be the correct entities to communicate with regarding the failure to pay the whole bill.

52. In sum, the Hospital has pursued all available levels of internal appeal under the Plan with respect to the Patient's medical care. Defendants confirmed this fact in a series of letters, all dated March 16, 2017, that were addressed to counsel for the Hospital in this matter.

53. Defendants' (a) refusal to pay more than 120% of Medicare, and further, (b) substitution of the "Reasonable and Customary" level of payment called for under the Plan with payment at 120% of Medicare in every instance; was arbitrary and capricious and an abuse of discretion, to the extent that Defendants were delegated discretion under the Plan.

54. In addition, Defendants' reliance on certain provisions in the SPD, termed the

"Allowable Claim Limits" provisions, was arbitrary and capricious, because the provisions (1) conflict with the MOOP; (2) conflict with the Plan's definition of Reasonable and Customary, and (3) violate ERISA's regulations with respect to SPDs by not being properly disclosed in a way that was clear and proximate to the other coverage provisions.  Therefore the Plan's attempt to impose an upper payment limit of 120% of Medicare is unenforceable as a matter of law.

55. Defendants' misinterpretation of the MOOP limit set forth in the Plan – both as to what amounts count towards that limit, and the level of payment by the Plan after that limit is met – also constitute arbitrary and capricious behavior and abuses of discretion, again, to the extent that Defendants were delegated discretion under the Plan.

56. The Hospital is entitled to payment at its full billed charges, which it contends, and will prove at trial, are Reasonable and Customary within the meaning of the Plan.

57. The Hospital also is entitled to its reasonable attorneys' fees under ERISA, given Defendants' repeated insistence on adhering to their unjustifiable interpretations of the Plan.

58. Finally, the Hospital reserves all its rights under ERISA, including the right to balance bill the Patient's estate, notwithstanding any language in the Plan that purports to force the Hospital to give up such rights.

**SECOND CAUSE OF ACTION**

**(ACA Section 2707(b) via ERISA Section 502(a)(1)(B))**

(Against All Defendants)

59. Hospital incorporates all allegations set forth in the above paragraphs.

60. The Hospital proceeds on this cause of action under ERISA pursuant to an assignment of benefits it has obtained to the Patient, as alleged above.

61. In the alternative, and to the extent that the Plan's interpretation of the MOOP provision contained in the Plan is not held to be an abuse of discretion and/or to violate ERISA, the Plan has nevertheless violated ACA's mandate that self-funded ERISA plans offer a MOOP applicable to all offered EHBs of no more than $6,600 in calendar year 2015.

62. ERISA is an appropriate mechanism for the enforcement of the federal ACA requirements imposed on self-funded ERISA plans.  *See, e.g.*, 29 U.S.C. § 1185d (incorporating

the provisions of part A of title XXVII of the PHS Act, including ACA Section 2707, into ERISA); *see also Harlick v. Blue Shield of Cal.*, 686 F.3d 699 (9th Cir. 2012) (en banc) (enforcing substantive coverage requirements imposed by Mental Health Parity Act upon ERISA plans).

63. The Hospital therefore, and in the alternative, seeks payment of the entire bill above the MOOP for the Patient's stay in a manner consistent with ACA's $6,600 MOOP limit for calendar year 2015, as further lowered by the Plan's own language setting the MOOP here at $3,000. Specifically, all out-of-pocket cost sharing amounts, including balance billing, must count towards the MOOP limit. After the MOOP limit is met, the Plan must pay 100% of the Hospital's charges.

64. The Hospital also is entitled to its reasonable attorneys' fees under ERISA.

65. Finally, the Hospital reserves all its rights under ERISA, including the right to balance bill the Patient's estate, notwithstanding any language in the Plan that purports to force the Hospital to give up such rights.

### THIRD CAUSE OF ACTION

**(Intentional Misrepresentation)**

(Against All Defendants)

66. Hospital incorporates all allegations set forth in the above paragraphs.

67. As alleged above, the Plan, through one or more of its representatives, affirmatively represented to the Hospital that it would cover 80% of the patient's inpatient hospital bill, subject to a $1,000 deductible and a $3,000 MOOP. The Plan further assured the Hospital that 100% of inpatient charges would be covered beyond that threshold. Other than a limit of 60 days of inpatient care, Defendants never stated any of the limitations or exclusions at the time, which they subsequently have sought to apply to pay far less. Stating the coverage without stating the alleged limits and exclusions to that coverage made the coverage statements misleading and the concealments into omissions of material facts.

68. At the times that these representations and concealments occurred, Defendants knew that the representations were false under Defendants' interpretation of the concealed parts of the SPD, and knew that they intended never to pay more than 80% of a much smaller base

amount, e.g., 120% of Medicare rates, or to comply with the MOOP.  Defendants' statements also were materially misleading because they failed to disclose that 80% would be calculated not based on the Hospital's full billed charges, but based on a much smaller, arbitrary, and inadequate level of payment.   Defendants nonetheless made these representations knowing that they were false, and/or made recklessly and without regard for their truth.

69. The Hospital reasonably relied upon Defendants' representations that the Plan would pay 80% of the Patient's bill for hospital services prior to the MOOP limit being met, and then 100% after the MOOP limit was met.  At no point did Defendants explain to the Hospital that the Plan purported to have a limitation or exclusion on benefits, whereby the Plan would not pay more than 120% of Medicare for all of the hospital services.

70. The Hospital was substantially harmed when Defendants instead chose to pay less than a third of the bills for the Patient's care.

71. The Hospital brings this cause of action in its own right, and not on behalf of the Patient.  This cause of action is distinct and separate from the ERISA causes of action, and is not preempted by ERISA.  *See, e.g.*, *The Meadows v. Employers Health Ins.*, 47 F.3d 1006 (9th Cir. 1995) (holding provider misrepresentation claims not preempted); *Morris B. Silver M.D., Inc. v. Int'l Longshore & Warehouse Union—Pacific Mar. Ass'n Welfare Pla*n, 206 Cal.Rptr.3d 461, 469-471 (2016) (same); *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir. 1990) (same).

72. Accordingly, the Hospital seeks 80% of its inpatient hospital charges prior to the MOOP limit being met, and then 100% of its inpatient hospital charges after the limit was met, consistent with Defendants' promises to the Hospital.

### FOURTH CAUSE OF ACTION

**(Negligent Misrepresentation)**

(Against All Defendants)

73. Hospital incorporates all allegations set forth in the above paragraphs.

74. As alleged above, the Plan, through one or more of the Defendants, affirmatively represented to the Hospital that it would cover 80% of the patient's inpatient hospital expenses,

subject to a $1,000 deductible and a $3,000 out-of-pocket maximum.  Defendants never stated any of the limitations or exclusions at the time which they subsequently have sought to apply to pay far less.

75. At the times that these representations were made, Defendants had no reasonable basis for believing that they were true.  Defendants knew that they intended never to pay more than 80% of a much smaller base amount, e.g., 120% of Medicare rates.  Defendants' statements were materially misleading because they failed to disclose that 80% would be calculated not based on the Hospital's full billed charges, but based on a much smaller, arbitrary, and inadequate level of payment.

76. The Hospital reasonably relied upon Defendants' representations that the Plan would pay 80% of inpatient hospital expenses prior to the MOOP limit being met, and then 100% of inpatient hospital expenses after the MOOP limit was met.  At no point did Defendants explain to the Hospital that the Plan purported to have a limitation or exclusion on benefits, whereby the Plan would not pay more than 120% of Medicare for all of the hospital services.

77. The Hospital was substantially harmed when Defendants instead chose to pay just 8% of the cost of the Patient's care.

78. The Hospital brings this cause of action in its own right, and not on behalf of the Patient.  This cause of action is distinct and separate from the ERISA causes of action, and is not preempted by ERISA.

79. Accordingly, the Hospital seeks 80% of its inpatient hospital charges prior to the MOOP limit being met, and then 100% of inpatient hospital charges after the limit was met, consistent with Defendants' promises to the Hospital.

**WHEREFORE**, The Hospital prays for and demand judgment against the Defendants as set forth above and as follows:

A. On the First Claim for Relief under ERISA, for an order compelling Defendants to immediately pay for the care provided to Patient in accordance with ERISA and the terms of the

Plan, based on a fair interpretation of Reasonable and Customary and the MOOP limitation in the plan, in the amount of $200,444.85, or alternatively, an amount to be proved at trial;

      B.    On the Second Claim for Relief under ERISA and ACA, for an order compelling Defendants to immediately and timely re-process the reimbursement claim for the care provided to Patient in accordance with the ACA MOOP requirements for calendar year 2016, such that the Plan must pay 100% of the Hospital's charges after accounting for the Plan's Deductible, in the amount of $200,444.85, or alternatively, in an amount to be proved at trial;

      C.    On the Third Claim for Relief (Intentional Misrepresentation), for an order requiring Defendants to Pay 80% of the Hospital's charges after accounting for the Deductible, as well as 100% of the Hospital's charges above the MOOP limit, in the amount of $200,444.85, or alternatively, in an amount to be proved at trial, plus punitive damages;

      D.    On the Fourth Claim for Relief (Negligent Misrepresentation), for an order requiring Defendants to Pay 80% of the Hospital's charges after accounting for the Deductible, as well as 100% of the Hospital's charges above the MOOP limit, in the amount of at least $200,444.85, or alternatively, in an amount to be proved at trial;

      E.    Awarding costs, including attorneys' fees to the full extent permitted under the law, including without limitation, pursuant to ERISA and any other applicable law; and

      F.    Awarding such other relief as the Court deems just, proper and available under the law.

Dated: July 10, 2017                    HOOPER, LUNDY & BOOKMAN, P.C.

By: _____/s/ Eric D. Chan_____
        ERIC D. CHAN
Attorneys for Salinas Valley Memorial Hospital System

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: July 10, 2017

HOOPER, LUNDY & BOOKMAN, P.C.

By: _____
ERIC D. CHAN
Attorneys for Salinas Valley Memorial Hospital System